Your Honors, and may it please the Court, Randy Fiedler, Assistant Federal Public Defender, Nevada. With me at Council Table is Assistant Federal Public Defender Hannah Nelson. We represent Petitioner Appellant Robert Ybarra.  After Atkins, there is no question that it is unconstitutional to execute someone with intellectual disability. And though federalism and comity mean deferring to state processes of providing that protection, they do not mean that states have unfettered discretion to define the full scope of the protection. Well, the Supreme Court did say, though, that it was up to the states to set the standards for determining developmental disability, or I'll use mentally retarded, because individual disability is whatever it is. And the Nevada Supreme Court, or the state legislature, enacted a statute post-Atkins that seemed to address the three prongs that the Supreme Court had identified, did it not? That is correct, Your Honor. Atkins did provide flexibility with the states to define mental retardation, although Atkins also cited to both the AAMR manual and the DSM-IV text revision. Nevada did subsequently adopt a statute adopting the same three prongs, and in construing its statute, Nevada Supreme Court relied on those clinical guidelines to construe its statute. But as a reviewing court on federal habeas, what we're looking at is whether or not the factual determination by the state courts basically satisfies the D2 prong under 2254, and whether or not the state courts properly applied Supreme Court law under D1 in reaching the conclusion that he was not mentally retarded. Correct, Your Honor. And to sort of piggyback, although we raised D1 to sort of preserve the argument, we also acknowledge that this court dealt with the D1 argument in its previous opinion, so that... I thought we had. That is correct, Your Honor. Yeah, okay. So, you know, conceding this law to the case, we preserved the issue, but primarily the question before this court right now is whether the Nevada Supreme Court decision resulted in an unreasonable determination of the facts. And this court's prior opinion observed two problems of particular poignance. First, under prong three, the Nevada Supreme Court suggested that any diagnostic testing after the age of 18 was of little value. And second, this court observed the prong one determination was unreasonable to the extent that it was based on the court's lay perception that Ibarra did not look like a disabled person. Well, didn't we send that back to the district court to address that very question? Correct, Your Honor. Yeah, I mean, we didn't purport to tell the district court how to resolve the question on remand. Correct, Your Honor. Okay. But the district court erred by reading these problems out of the Nevada Supreme Court opinion. And this court's prior observations explain why the Nevada Supreme Court's opinion resulted in an unreasonable determination of facts, which is, again, the main issue before the court right now. But we do have the benefit, I think as we had before, of a 42-page opinion from the criminal case and who conducted the evidentiary hearing on collateral review. And that judge essentially, as I read the record, credited Dr. Gittrud's 1981 test as basically being the only reliable test for a variety of reasons that the court articulated. Am I correct in characterizing the trial court's ruling? Yes. With one slight difference, which is that it was a different trial judge and the Atkins judge. It was the same court. But, yes, the state district court did credit the 1981 IQ test. The state district court also conducted a malingering analysis that substantially reached beyond what the state's expert, Dr. Ted Young, testified to. And both of those issues were the subject or were part of the subject of Mr. Ibarra's to the Nevada Supreme Court. But we do have a factual determination, do we not, I hesitate to call it an adverse credibility finding because it's not quite that in an immigration context. But essentially, the trial judge credited the opinion offered by the state's expert over the two defense experts as a result of that hearing. Yes, but I would gently push back because it's a little complicated what the state district court did. Dr. Ted Young's testimony did not go well. And the reason I say that is Dr. Ted Young testified. So his conclusion was, I administered the test of memory malingering, and on the basis of the test, I conclude that Mr. Ibarra was malingering. And the trial court credited that opinion, did it not? Yes. But crediting that opinion was a very small part of the state district court's overall opinion as to both malingering. Well, I mean, the trial court also, I think, relied pretty heavily on the kites and the written correspondence from prison that Mr. Ibarra had made in essentially in saying, look, in unguarded moments, this evidence is pretty persuasive that he is not dysfunctional, I guess, is the way I would put it. Am I reading the record correctly? Yes, Your Honor. But there are, I think, two important points from Your Honor's reading of the record that are important from the Nevada Supreme Court opinion. First is, Mr. Ibarra challenges Dr. Ted Young's reliance of the tom to the Nevada Supreme Court. And as part of its fundamental error related to prong three, the Nevada Supreme Court kind of disregards the tom, assigning it little value because it occurred after the developmental period. So are you saying that the Nevada Supreme Court didn't think he was malingering? No. Because that's not how I read the Nevada Supreme Court's decision. They essentially adopt the reasoning of the trial court in affirming the trial court's denial of habeas relief. Well, except for the test of memory malingering. And except for the 1981 IQ test. Well, you can think of the test, but the question is whether or not there was evidence of malingering. And both the trial court and the appellate court concluded he was, which is what rendered the opinions of the defense experts less worthy of belief than the opinion of the state's expert. Isn't that what those opinions say? That is what the opinions say, but once the test of memory malingering is sort of set in this box as being of little value, the other evidence falls into the other issue with the Nevada Supreme Court's analysis, which is that it was relying on stereotype evidence. So this evidence... I'm sorry, stereo? Stereotype evidence. Evidence based on the court's lay perception about how someone with intellectual disability should or could function. When you say stereotypes, though, the record had 3,000 pages of documentary evidence in addition to the testimony of the witnesses. So in making the prong one, two, and three analysis under the Nevada statute, isn't it more difficult for the courts to look at all of that evidence and trying to conclude whether or not this person meets all three prongs? Yes, but if the court is going to ignore the testimony or analyses of the experts, the court's really taking a risk. And here, that risk is borne out because clinicians... You say ignore, but I'm not sure that's a fair characterization, at least as I read the record. The fact that in 42 pages, the trial judge didn't necessarily address each and every piece of evidence that was introduced at the hearing, in essence, what I hear you asking us to do is to sort of re-weigh the evidence and declare the factual determinations unreasonable. And I don't think AEDPA allows us to do that. Well, we're not asking the court to re-weigh the evidence. What we're asking the court to do is to acknowledge that none of the experts testify that this was an appropriate, malingering analysis. Is that a necessary element? Is the finder of fact required to adopt a theory espoused by one of the experts? No, but I think if the court goes sort of out on its own, it runs the risk, a risk that is realized here, where the court is engaging in an aclinical analysis that effectively undermines the ability of Atkins to protect anyone. Because to take... But you're not arguing that this is a determination that only qualified medical, mental health care professionals can render, are you? The statute doesn't contemplate that. It doesn't leave the decision to the psychiatrist and the psychologist. Correct. I think in this regard, Hall and Moore and Broomfield are helpful in that they reflect the fact that ultimately it's the court's determination, but the court's determination needs to be informed by the clinical guidelines. But we have to be a little bit careful, though, because some of those cases were decided after the state court's decision, were they not? Correct. But Broomfield was a case applying deference to a state court determination, and what happened in Broomfield was the state court was purporting to apply the clinical guidelines, but then was misapplying them, and so the U.S. Supreme Court concluded that the state court's determination resulted in an unreasonable determination. When you say clinical guidelines, are you talking about the DSM and the Psychiatrist Association? Yeah, and I think in Broomfield it was the AAMR-10, but yes, those guidelines. But the state legislature didn't incorporate those guidelines into state law, did they? They used the terms of art, and then the question is, does this particular inmate meet that particular term in the prong? That's correct. That's what the legislature did. I mean, they used the same language. The Nevada Supreme Court, though, then, in construing that language, and it happened in Mr. Ibarra's case, then referred to the clinical guidelines to construe the statutes. Well, they're clearly relevant. I guess the question is whether or not they're controlling as if they were part of the statutory prong. Do you understand the distinction that I'm wrestling with here? Yes, yes. Yeah, and I think this distinction, the distinction Your Honor is trying to make, is particularly important in light of this court's decision in Pizzuto, which drew the very same distinction. But in Pizzuto, the court was in a situation where the state court was only construing state law. In our situation here, the Nevada Supreme Court brought the clinical guidelines into its assessment and in construing Nevada statutes. So because, like Broomfield, the Nevada Supreme Court was purporting to apply the clinical guidelines is an unreasonable determination of facts. That really is taking the position that when the legislature enacts the statute, it incorporates by reference those guidelines. And I'm not sure the law goes that far. I guess I'm saying I would agree that the law doesn't go that far, but I think once the Nevada Supreme Court incorporates the clinical guidelines for purposes of Broomfield, for purposes of whether there was a reasonable determination of facts, that's how the clinical guidelines would go. I mean, one of the problems I have is that we've got three experts here. Two of them applying the guidelines come out with different opinions than the state's expert did. And the state courts essentially adopted the opinion of the state's expert and looked at all the other evidence of record in order to assess whether or not Mr. Ybarra met each of the three prongs. And I'm trying to figure out what's wrong with the analytical approach that the Nevada Supreme Court took here. Well, there are two things, and one is I disagree a little bit with Your Honor's characterization of what the state courts did, because the Nevada Supreme Court did not adopt Ted Young's analysis. Dr. Ted Young's analysis really was specific to the time. He referenced a number of times that his conclusion was based solely on the time and that you could not draw a conclusion from any of the other information. But the court also decided, did it not, that the only credible test of IQ in the record was the 1981 assessment by Dr. Guttreid, and that resulted in an IQ that was well beyond what prong one requires, even accommodating for the Flynn effect. But that's not what the Nevada Supreme Court did. The Nevada Supreme Court assigned the 1981 IQ test little value with all the other IQ tests and the TOM. Well, is it really quite as sweeping? They didn't say no value. They said little value. And their opinion does discuss other parts of the evidence. I get the thrust, and it seems to be the main thrust of your argument, that is, the discounting by the Nevada Supreme Court of anything that happened after he turned 18. We don't pay attention to those tests. But they don't actually say, we don't pay attention. And their discussion suggests that they don't stop right there by saying, well, there's no test before he turned 18 that demonstrates the intellectual disability, so game over. They don't say that. And so it's a little like reading tea leaves to understand what the decision rests on. But I'm not sure I'm as confident as your argument suggests that I should be that they simply close their eyes to anything else or close their eyes to Dr. T. Young, who reached a conclusion with regard to prong one consistent with what the Nevada Supreme Court ultimately adopted. Perhaps not exactly the same path, but can we really say that, no, they didn't go down that road. They disregarded what he had to say. So the language is a little equivocal on what exactly the Nevada Supreme Court was doing in terms of applying no value or how much value. But there are a number of indications in the court's opinion that reflect its understanding that post-18 evidence was not really part of its analysis. And I will not give you all five examples, unless the court wants them. But we'll start with, this is volume one, page 48 and 49, summarizing the state district court record the Nevada Supreme Court wrote. The district court found that the developmental period was childhood to 18, but nevertheless considered evidence of mental retardation between the ages of 18 and 25. We've already talked about the language with regard to the 1981 IQ test and how, like all of Mr. Ybarra's IQ tests, it was administered after he turned 18. Well, counsel, I'm sort of with Judge Clifton here in having the concern that he's raising. If it's true that the Nevada Supreme Court decided that everything outside the onset age was really not meaningful, not material, there would have been no reason to talk about the Flynn effect, to talk about why, like how it would work and how the calculation would go and weighing the different arguments, and then ultimately it says we're not going to definitively decide this issue and lays out the three reasons, only one of them being all of this falls outside of the date range anyways. So with that set up, how can we read this as them saying this information is not material because of it's outside the date range? That's one of the things it said, but it said a bunch of other things that would be totally irrelevant if that's the only thing that it was deciding on. Yes, the, and I think part of this is, you know, the Nevada Supreme Court opinion is maybe not as clear as any of us would like, but the part of the issue with the Nevada Supreme Court's treatment of Mr. Ibarra's appeal is he's raising a number of problems with, you know, to take the 1981 IQ test as an example, a number of issues related to the 1981 IQ test and saying, and look, because of those issues, the 1981 IQ test is not dispositive of Mr. Ibarra's significance of average intellectual functioning. And what the Nevada Supreme Court, in effect, is saying is, well, here are the reasons we don't have to resolve this issue, so because we don't have to resolve it, we're not going to. And one of the reasons was because even if we give it, even if we take the argument about the Flynn effect into account, it still doesn't get in there as a matter of sort of material evidence, not as a matter of this is irrelevant to consider because it's outside the date. Yes, but the Nevada Supreme Court does not take the next step of saying this 78 IQ, you know, Flynn adjusted IQ score disqualifies Ibarra from relief. But that's where they go on to discuss the other evidence. That's where I'm having a hard time following your argument because they didn't stop at that point. Then they went on to look at things like the kites, and the kites show, you know, pretty clear organized thinking in terms of, you know, sending requests for medical refills, trying to get access to mental health treatises that these doctors are talking about. I mean, isn't that all relevant to the functionality determination under Prong 1? Or excuse me, Prong 2, I guess it would be. Well, the Nevada Supreme Court addressed it for both Prongs. Prong 1 is primarily at issue here because the U.S. District Court found that the Nevada Supreme Court's determination on Prong 2 was an unreasonable determination of the facts. But to answer your Honor's question, yes, the court went on to consider, you know, these other pieces of evidence, but the experts didn't talk about that evidence. And clinicians, as Dr. Greenspan suggests in his report, would not rely on that evidence as part of their subaverage intellectual functioning because, for example, with prison correspondents, there are a lot of questions that clinicians have about who wrote this, did somebody help with this. Well, I thought we had a finding by the state trial judge from the evidentiary hearing that the court was satisfied that he had authored them, not that somebody else wrote them for him. I mean, the handwriting in most of them appears to be the same. I think there was one I saw that looked like it could have been written by somebody else, but, I mean, we're talking about many, many, many written kites and letters. But the other reason that that kind of evidence would not be dispositive is that people with intellectual disability can write, and I think that... Well, so let me, I want to make this a little bit more pointed. The Nevada Supreme Court, in interpreting the Nevada statute about how to do this analysis, on prong one says, you're going to measure functional limitations in large part by IQ tests, and that's why everybody was paying attention to those. And then it says, other evidence may be used, particularly when you don't have any IQ tests, other evidence may be used to demonstrate subaverage intellectual functioning, such as school and other records. Is it your position that these kites and the writings don't come within the scope of that statement by the Nevada Supreme Court? No, Your Honor. So you are saying that those are the kinds of records that a court might look at if it doesn't have clinical evidence? Yes, Your Honor, but the difficulty with what the Nevada Supreme Court did here was, because of its understanding of the age of onset analysis, it set aside all of the diagnostic testing in the case, and then replaced that diagnostic testing with this other material, which no expert provided any testimony about how to weigh or... Your Honor, I would say perhaps it did that, but before that, it set aside all of that diagnostic testing for clinical reasons, for conclusions that the testing was invalid. And then it also said, oh, and it's outside the date range. Sort of like two bases there. Right, and this goes to what Dr. Ted Young's testimony was and what the Nevada Supreme Court did with it. Dr. Ted Young's conclusion related to malingering was based on the TOM, which the Nevada Supreme Court assigned little value. Except for that's not the only evidence of malingering in the record. There was quite a bit other evidence of malingering. But it's the only evidence that Dr. Ted Young relied on. And I think one other... I don't think that's accurate, counsel. I mean, for example, there was a witness testimony, I believe by maybe either former inmates or correctional officers, about how your client made statements in prison, you know, I have to act crazy in order to get a not guilty by reason of insanity. Or, you know, there was suggestions by some of the Lakes Crossing doctors that in order to manipulate his jail assignments, he acted crazy in the county jail, so they'd have to send him to the nicer Lakes Crossing facility, which apparently was less onerous to be incarcerated in. I mean, can't the court consider that under the functioning prong in order to determine whether or not this person is so intellectually disabled that he meets the exemption from execution? Well, two responses, Your Honor. First, I mean, Dr. Ted Young did not talk about that stuff. But there's evidence in the record from the reports of the Lakes Crossing doctors that they made these observations. Isn't that proper for the court to consider? Yes, but I think one important point about that evidence, which came up during the evidentiary hearing, is at the same time that prior mental health professionals were talking about whether Mr. Ibarra was feigning or exaggerating symptoms, he was also receiving psychotropic medications. He was also receiving diagnoses of mental illnesses. Okay, but the question is whether or not he's, I guess, if I can put it in layman's terms, so mentally retarded that he shouldn't be put to death because he has absolutely no comprehension or understanding of why he's being executed. I mean, isn't that the whole purpose behind Atkins? We don't execute people who are so mentally retarded that they don't realize that this is their punishment for the crime they committed? Well, I think there's an important distinction here between Atkins and a forward incompetency to be executed claim. Because for Atkins, Mr. Ibarra or whoever's ability to understand the reason behind the execution is not part of the analysis, as it would be for a forward competency claim. And I would just emphasize that in analyzing intellectual, sub-average intellectual functioning, the guidelines prescribed that you look at intelligence testing, here the... Is your position that if you can't, if you don't have evidence of intelligence testing, either because it wasn't done or in this case, the results are invalid because of malingering or for whatever other reason, that the state courts can't look to any other evidence in order to make that determination? It's purely a medical decision by psychiatrists and psychologists based on testing? At the very least, it needs to be informed by clinical consensus. And I've gone over, so I'd like to reserve my remaining time, unless there are other questions. I have one final question that maybe you want to think about and for rebuttal. The argument about malingering, what I'm struggling with there is, maybe that issue is law of the case and not even before us. So our last decision in this case, I quote, we agree that the malingering determination was reasonable in light of the clinical expertise. With that statement, can we even revisit the malingering issue? And if you want to think about that and talk about it on rebuttal, I'm fine with that. I will briefly respond so that Mr. Connor can have his say about the same question. Although the court did say that, I do not view it as law of the case because the court also was explicit that it was not taking a position on the 2254-D2 analysis for the district court. May it please the court, Jeffrey Connor from the Nevada Attorney General's Office on behalf of the respondents. I think this afternoon, I'd actually like to start with an analogy that the court used at the last argument was looking at the intellectual disability analysis as a three-legged stool. And that if one of the legs is not satisfied, then the stool falls. I think that fits well here, and the court can continue to use that analogy to look at this case for a number of reasons. Can I jump in? I have a procedural thing that I'm trying to figure out. So in this court's prior decision, it remanded on prong one, saying a few things, including unclear what the Nevada Supreme Court was actually relying on in finding that prong one wasn't satisfied. So this court said, unclear, we don't really know what the Nevada Supreme Court was doing, and we remand to the district court to figure that out. So my first question is, what happened on remand? Was there any further hearing? Was there any further evidence? Did the record change at all? No, it was just briefing. Briefing and then a new decision from the district court. New decision from the district court, and then they filed a 59E motion after the district court's order on the 60B motion, and so a second order. So there were two orders from below. So that's sort of a lead-up to this is the question, really. Where we said previously, we can't figure out what the Nevada Supreme Court actually relied on on prong one. Can we actually revisit that now? And I ask that because, one, the record hasn't changed. The Nevada Supreme Court's decision hasn't changed. It's not like Nevada has clarified what it did from before. So we have the exact same decision and words that we're looking at, and we review the district court de novo. So I'm struggling with, what was the point? What has the district court added for us? We were confused before about the reasons that the Nevada Supreme Court relied on. How can we not be confused still when nothing has changed? I think there's two things that you can look at here, but being that the district court here, in looking at the record as a whole, determined that the Nevada Supreme Court's analysis on prong one, although it did mention things like, you know, that there's one part where they mentioned his ability to play, you know, games and volleyball and things like that, that might look like it was relying on lay stereotypes. Like, that's what this court was concerned about, right, was whether or not there was... The Nevada Supreme Court was making a determination based on, this is what we think an intellectually disabled person looks like, as opposed to, were they actually looking at the sort of evidence that state law, how the legislature defined intellectual disability, are these the kinds of things, in light of the Atkins decision that a state court can consider for purposes of determining whether or not somebody's intellectually disabled or not. And I think the district court's order goes through that and recognizes that this wasn't really... I think Your Honor correctly pointed out that the Nevada Supreme Court's analysis doesn't just go straight to the, it's outside the developmental period until we cannot consider it. First, they address the Flynn effect and recognize that even if we apply the Flynn effect, it only comes back to a 78, which puts him outside the range for satisfying prong one under Nevada law. I mean, that gets to my issue, right? I read the Nevada Supreme Court as having these three reasons that don't necessarily rely on each other, don't necessarily build on each other, that they could be independent reasons. And if that's true, then at least reason number one could independently support its determination that prong one is not satisfied. What I'm struggling with is this court has previously said we can't tell how the Nevada Supreme Court decided that issue. So am I free to look at the Nevada Supreme Court's decision and say, well, this is how I read it, and I don't, I'm not... I think you are for the exact reason that my colleague responded to your question, which is that the court did say, we're not saying what, we're not telling the district court what to do, we're not saying we think it's this, we think it's that. So there was not an actual decision with respect to whether or not 2254-D2 had been satisfied. And so I think this court is still free to answer that question. And so, and I agree with you, Your Honor, that the analysis regarding the Flynn effect, where the Nevada Supreme Court says we don't need to decide the effect, the impact of the Flynn effect, because we think that the trial court judge, his calculation based on the Flynn effect is not without foundation. Importantly, that calculation is also confirmed by the Greenspan report. Dr. Greenspan agrees that when you apply the Flynn effect, it reduces the score from 86 to 78, which puts him outside the range for intellectual disability on prong one, and coming back to the Stuhl analogy, if he can't satisfy prong one, the court doesn't need to go any further. So I would also like to address a couple things  similar to this court's decision in Smith v. Ryan, which is cited in the briefing. The fact that raw data is not available to look at a test is not a reason for excluding it. Dr. Smith testified that he couldn't actually say that the test itself was invalid, and the state district court, the trial court appropriately rejected Dr. Smith's suggestion that the 1981 test was invalid. So we've got a valid score that puts him outside the range. This court, as pointed out, did already suggest that the state courts could reasonably rely upon the malingering analysis, and I think the malingering... I disagree with my colleague's characterization of Dr. Ted Young's testimony. I think if you go look at Dr. Young's testimony, he spends a great amount of time talking about the mental health records and other things in the record that confirm his determination that the test that he conducted was invalid, and the reason he determined that that test was invalid was because of the bizarre results that he received. So he first determines that the test is invalid, and then he does the Tom test for purposes of determining whether or not Mr. Ibarra was giving his best effort on the test or not. I mean, wasn't one of the reasons that the Nevada Supreme Court had problems with the other clinical tests is that those examiners never even addressed malingering? Correct. That was one of the trial court's reasons for not crediting their opinions was that, well, at least Dr. Schmitt's analysis on prong one was because he did nothing to account for malingering. Dr. Mitchell-Young only really provided testimony with respect to prong two, but indicated in his own report that he did identify signs that Ibarra was malingering. And so it's wrong to say that the only clinical evidence that was in front of the state courts on malingering was from Dr. Ted Young. Dr. Mitchell-Young also identified signs of malingering in his testing, and the testing that he did indicated came back with a score of 79, which once again would put Ibarra outside the range for intellectual disability. That, of course, wasn't a Weschler IQ test. He was doing the, I think it was the SSQ test, and that test came back with a score of 79, which he, I believe, testified, or at least was in his report, that that would amount to a similar score as a Weschler-type test, and came back with a score of 79, which puts him in the borderline range. And that was in his report. He wanted to change that at the evidentiary hearing after he listened to Dr. Schmidt testify. But importantly, Dr. Mitchell-Young also found signs of malingering. The other thing that I would point out with respect to the Tom test, there's an interesting tidbit here, is that when Ibarra filed his Rule 60B motion in the district court, they attached to it a declaration from Dr. Greenspan, which is different than the declaration that was later filed with the motion in the Nevada Supreme Court. And you can look at Volume 18, Excerpts of Record 5137. Dr. Greenspan specifically referenced the Tom test as being the appropriate test for determining malingering. He changes his position on that in the declaration that's filed with the Nevada Supreme Court. But originally, Dr. Greenspan suggested that the Tom test was the right test to do to test malingering. So I think there's strong support in the record for both the trial court's validation or finding the 1981 test score to be a valid measure of Mr. Ibarra's intellectual abilities and to support the trial court's decision to find that the subsequent tests that were conducted by Dr. Schmidt and Dr. Ted Young did not return a valid measure of his intellectual capability. Turning to the district court's resolution of Prong 3, of course, I think was a correct resolution of that, that if Prong 1 fails, and he's failed to establish the existence of a condition to begin with, there's no need for an analysis on the age of onset because there can't be an onset of a nonexistent condition. So the district court correctly resolved Prong 3 in addition to its correct analysis on Prong 1. I do disagree with the district court's resolution of Prong 2, and I think that when you look at the trial court's order at Volume 1, Excerpts of Record 94 through 100, that's the part of the trial court's order where the trial judge is discussing the evidence in the record and comparing it to what Dr. Schmidt was identifying as the basis for finding adaptive deficits. We are not in a situation here similar to what the Supreme Court dealt with in Moore where the Supreme Court acknowledged that the Texas Criminal Court of Appeals was sort of saying, well, yeah, he's got a weakness in this area, but he's got a strength in this area, and that counterbalances it. That, the Supreme Court recognized, was inconsistent with the medical consensus on how you look at Prong 2. But there's a footnote, footnote 8 in Moore v. Texas, recognizes a point that the dissent raised in that case about disagreement in the medical community about whether you could look at strengths and weaknesses within the scope of the same area of adaptive functioning, and that's essentially what the trial court judge did here in some senses, but also in others, it was just simply that he specifically identified factual evidence in the record that undermined the facts that Dr. Schmidt said supported his analysis of why there was adaptive deficits. And so that part of the record specifically identifies what it is that the district court identified that was inconsistent with what Dr. Schmidt identified as being the basis for his determination on Prong 2. I want to go back to the issue that's been touched on before and trying to ascertain the grounds actually relied upon by the state Supreme Court. So let me ask what you make of the statement in its opinion that, well, little value is the phrase that it uses, and it comes after it says we don't have to decide the relevance of the Flynn effect and how we analyze the 1981 IQ score because that took place well after he was 18, so it just doesn't count. If you decide that it just doesn't count, well, that does seem to open the door to the argument made by Petitioner that that element, at least, doesn't appear to be a reasonable finding of fact. So what do you make of it? So I think two points with that is I think at least to the extent the court was dealing with the Flynn effect, basically it was saying we don't have to decide whether or not that would, even if we applied the Flynn effect as Dr. Schmidt would and say that it could reduce the score by up to 15 points. Dr. Schmidt never said it had to be 15 points. He didn't say how much you would actually have to reduce the score by. He just said it could be up to 15 points. But what the court was saying is even if the score was reduced as much as Dr. Schmidt says it might be reduced by, we don't have to decide that because the primary relevant issue is whether he has shown that the sub-average intellectual functioning had an age of onset before he reached 18. So I don't think that they're saying we give it no weight at all. It only becomes a consideration, and then he still has to carry his burden of showing the age of onset requirement. And I think when you do look at the record here, where that starts to fall apart, and the trial court's order talks about a lot of this stuff, there's lots of information from his military records and other things identifying him as being dull normal, low normal, or low intelligence. And the experts recognize that dull normal is no longer a used term anymore. It's kind of gone the way of mental retardation and is now referred to as borderline. There's lots of evidence in the record identifying him as being borderline from around the period that he turned 18 in his early 20s up until the offense was committed. And so even if you apply the Flynn effect in a way that would put the 1981 score within the range for satisfying sub-average intellectual functioning, you still then have to go to the age of onset prong and identify whether or not there's evidence consistent with that in the record that would support the conclusion that the sub-average intellectual functioning was existent and had an age of onset before he grew out of the developmental period. And I think that that record evidence about the borderline, low normal, dull normal, all of that undercuts his ability to establish that even if the 1981 score was applying the Flynn effect, you had to discount it by 15 points, which would bring it down to a 71, which would be in the range for the standard error of measure, that it's still his burden to show that the sub-average intellectual functioning existed before he reached the age of 18. So I think that's kind of what the navigation court was saying, is that we don't have to decide because even if you still get to prong 3 and then he didn't carry the burden on prong 3. Unless the court has any further questions, I'll submit and have a seat. Thank you. Just ask the court to affirm. Thank you. I have two quick points and two bigger points. I'm going to start with the quick points. First, in response to Your Honor's question about what has changed, there is one important change between this court's prior opinion and what was before the U.S. DISH report, which is the Greenspan report. One of the issues in the prior appeal was whether the Greenspan report was properly part of the record for purposes of the 2254D analysis. So Judge Navarro had the benefit of the Greenspan report. Is that relevant to prong 1? I understand its relevance, particularly to prong 2. Is it relevant to prong 1? Yes, because Dr. Greenspan's report addresses both the 1981 IQ test and also the test of memory malingering. My other quick point was Mr. Conner referenced the two versions of the report. I just want to point out that the language that Dr. Greenspan used to describe the TOM was that it was, quote, the most widely used, which is language that is in both reports. And the report that was actually filed with the Nevada Supreme Court, which is part of the state court record for the 2254D analysis, just adds some more analysis about why the TOM is not, why there are reasons to question the TOM as an accurate predictor of malingering. Can you address the point that your opponent made about the change in Dr. Greenspan's opinion on the TOM test? What I'm trying to convey is that there was not a change. In both reports, his language was this is the most widely used test. The difference with regard to the discussion about the TOM was that Dr. Greenspan added some research calling into question what an appropriate cutoff score would be for a TOM, but his ultimate conclusion that Mr. Ibarra met significance of average intellectual functioning was the same and that Dr. Ted Young's analysis was not by itself dispositive. To go back to your Honor's question about prong one in Dr. Greenspan's report, Dr. Greenspan, I think there are two particularly important parts of Dr. Greenspan's analysis that are relevant for prong one. First, he notes that the IQ score after it is adjusted for Flynn is pretty close to the cutoff. He raises the same concerns that Dr. Schmidt raised about relying on an IQ test without the raw data being available, and he refers to Dr. Schmidt. If the data itself is not available, doesn't that result in an inability on the part of the defense experts to attack it other than to say we don't know because we can't see the raw test data? It seems to me they went one step further. They said the test is not reliable because we don't have the raw data to confirm its reliability. They were, yes, but with a little more nuance. The nuance is that clinicians would not rely on an earlier test without having access to the raw data to confirm that the test was scored. I understand, but assuming the test was properly administered, then there wouldn't be a problem with it, right? Yes, but they're saying we don't know. We think because an intern did it, it's suspect, and we can't look at the raw data. Yes, and because scoring, there is some variability in scoring. I'm out of time. I would just make one last point with the Court's permission, which is that Dr. Greenspan addresses the internal congruence between Dr. Schmidt's, Dr. Ted Young's, and Dr. Mack's IQ tests, and that's one of his bases for concluding that Mr. Ibarra suffers from significance of average intellectual functioning. Thank you, counsel. All right, thank you to both counsel for your helpful argument. The matter of Ibarra v. Gutierrez will be submitted, and we're in recess for the afternoon. All rise. This Court for this session stands adjourned.
judges: TALLMAN, CLIFTON, FORREST